**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| Sharona A. Grunspan, | ) | **CASE NO. 10 CV 2581** |
| | ) | |
| Plaintiff, | ) | **JUDGE PATRICIA A. GAUGHAN** |
| | ) | |
| Vs. | ) | |
| | ) | |
| United States of America, | ) | **Memorandum of Opinion and Order** |
| | ) | |
| Defendant. | ) | |

### Introduction

This matter is before the Court upon plaintiff's Motion for Summary Judgment (Doc. 19) and United States of America's Motion for Summary Judgment (Doc. 33).  For the following reasons, plaintiff's motion is DENIED and defendant's motion is GRANTED.

### Facts

Plaintiff Sharona A. Grunspan filed this Complaint for Refund of Taxes against the United States of America and the Commissioner of Internal Revenue[1].  An Amended Complaint

---

[1]    Defendant states in its Answer that the Commissioner of Internal Revenue is not a proper party herein.  The Court hereby dismisses this party as improperly named.

1

was filed which alleges that on September 15, 2003, the Internal Revenue Service (IRS) assessed

the 26 U.S.C. § 6672 Responsible Party 100% penalty against plaintiff for the second quarter of

2002 in the amount of $128,995.83.  On four dates in 2009, plaintiff paid refundable amounts

toward the penalties in the total amount of $1,126.65.  A refund claim for the latter amount was

disallowed by the IRS.  Plaintiff alleges that she is not a responsible party, and seeks judgment

providing her a refund in the amount of $1,126.65 and for the abatement of any penalty.[2]

   The following facts are taken from the evidence submitted by the parties.  Plaintiff has a

Bachelor of Science degree in accounting.  She became a certified public accountant in 1978, but

has been on inactive status since around 1992.  During the time in question, plaintiff understood

that a corporation withholds a certain amount of income and Social Security taxes from the

wages of its employees with each payroll and holds those moneys in trust until due to be

deposited with the IRS.  (pltf. depo.)[3]

   In 1983, plaintiff, who had been married previously, married Willie Grunspan who is

now deceased. At the time, plaintiff was a single mother who was "very thankful" to find a man

who would marry her with a child. (*Id.*)

---

  *See Blachy v. Butcher,* 221 F.3d 896 (6th Cir. 2000)(recognizing that the IRS is not a proper party), *Render v. IRS*, 389 F.Supp.2d 808 (E.D.Mich. 2005) (The United States is the proper party, not the IRS.)

[2] Defendant states in a footnote in its reply brief, "There is more at stake in this case than the $1,126.65 of payments against the $128,995.83 assessment relating to Victory Park for the second quarter of 2002. ... Plaintiff filed administrative refund claims for the balance she paid for that assessment, and for two other quarterly assessments relating to Victory Park, totaling over $125,000.  (Doc. 35 at fn 12) The Court is only concerned with the Complaint filed herein.

[3] Plaintiff's deposition was taken on two dates and, consequently, consists of two volumes.

2

Plaintiff worked in the accounting field through 1991.  Before plaintiff met him, Mr. Grunspan "was running nursing homes for many years."  Plaintiff "was just an accountant ... [and] knew nothing from running nursing homes."  She worked for accounting firms and "did bookkeeping and accounting."  In 1993, plaintiff and her husband purchased a nursing home, and renamed it Beachwood Nursing Home.  Plaintiff "guesses" she was the controller, finance director.  (*Id.*)

Beginning in 1995, Mr. Grunspan acquired land and started planning a new nursing home facility which opened in 1998 as Emerald Ridge.  Mr. Grunspan "was the wheeler and dealer, and [plaintiff] was the pencil pusher," doing whatever her husband required of her.  In 2000, Mr. Grunspan invested with others in nursing homes, but plaintiff had no involvement in these businesses.  (*Id.*)

In 2000, plaintiff's husband approached her with a "done deal" to invest in a nursing home, Victory Park[4], with Hugh Clark and Brian Marrie.  Plaintiff was "very much against it,"but gave in as "I would just give in to things.  He wanted to do it.  I let him do it.  I was single for 11 years... and didn't want to be left on the street."  While Mr. Grunspan was never physically abusive towards plaintiff, he "had a very bad temper" which showed when he "threw plates around" and was disrespectful of plaintiff in front of others.  When plaintiff told Mr. Grunspan that she would not sign the Victory Park papers, he threw plaintiff's clothes in their backyard and put his clothes in the car and drove to a hotel.  Plaintiff drove to the hotel, returned

---

[4]     In addition to the nursing home, the Grunspans also acquired the assisted living care business referred to as Victoria Retirement Community, Inc.  As the issue herein involves only plaintiff's liability concerning Victory Park, the discussion herein addresses only Victory Park.

3

Mr. Grunspan's clothes to the house, and called her attorney asking him to "get us back together because I don't want to be alone again."  After that, plaintiff signed the papers to acquire Victory Park.   The Grunspans each owned 26% of the business, and Clark and Marrie each owned 24%.  Plaintiff was named treasurer of Victory Park.  Plaintiff testified that she was an officer "by name only." She does not know whether she was a director.  (*Id.*)

Plaintiff points to the testimony of Lynda Fanara, whom she characterizes as the Grunspans's housekeeper.  Defendant shows, however, that Fanara's testimony is that she was a receptionist at the Beachwood Nursing Home and an assistant to plaintiff.  She would visit the Grunspans's house to accomplish personal errands and tasks for plaintiff. According to Fanara, plaintiff was "always in tears" because Mr. Grunspan "stressed her out" about the businesses, and he "was always, always, always yelling and screaming at her.  It would totally embarrass her."  Mr. Grunspan "would never listen" to plaintiff.  (Fanara depo.)

During 2000 through January 2002, Clark and Marrie handled the day-to-day operations of the nursing home. In late 2001, Mr. Grunspan received Victory Park's 2000 income tax return which showed a "phenomenal loss."  This prompted him to request financial records from Clark and Marrie and to direct plaintiff to write letters to them which he dictated.  Plaintiff and her husband visited Victory Park "to see what was going on," and plaintiff examined the books and records in November and December 2001.  It was learned that Clark and Marrie were only using the company funds to pay management fees and to pay personal expenses of family members.  In November or December 2001, plaintiff and her husband learned that Victory Park had not paid its withholding taxes. Through her review of the records, plaintiff learned in November 2001 that Victory Park had unpaid withholding taxes in the amount of $165,000 for the first three quarters

4

of 2001.  She presented this to her husband, but there was "nothing she could do" because she "just did the paperwork."  "They were running the show.  I did nothing."  (pltf. depo.)

Beginning in the early part of 2002, plaintiff and her husband attempted to "wrangle control" from Clark and Marrie.  In January 2002, Clark and Marrie were removed as authorized signators on the checking account, and only plaintiff and her husband could sign checks for Victory Park during the second and third quarters of 2002.  According to plaintiff, however, Mr. Grunspan retained control of all the funds and she wrote checks at his direction.  Ultimately, the Victory Park lease was terminated and Clark and Marrie were forced out.  Plaintiff told her husband that "you can't play with the IRS."  But when plaintiff suggested paying the outstanding withholding taxes from another fund, Mr. Grunspan "basically said I'm going to kill you if you pay those taxes from anywhere else.  He says, don't you dare fund anything that those guys took away from us."   According to plaintiff, her husband threatened her but she "didn't believe him."  (*Id.*)

Fanara testified that her "observation" was that Mr. Grunspan "made the final decision," "he was the boss,"he made all the determinations about which bills to pay for all the nursing homes, and plaintiff would never make a decision without going through him. But, Fanara acknowledged that "I know nothing about Victory Park." She first learned of Victory Park's withholding tax problem when plaintiff asked her in 2011 to be a witness in the case. (Fanara depo.)

In December 2001 or January 2002, Greg Taylor, who administered Victory Park's payroll system, was informed by his supervisor that he would thereafter report to plaintiff and her husband rather than Marrie and Clark.  According to Taylor, Clark and Marrie were no

5

longer working at Victory Park by February 2002 and plaintiff had informed him that their access to funds had been terminated. Around the end of 2001 or early 2002, Taylor met with plaintiff at which time they discussed unpaid employment taxes and notices sent by the IRS. Plaintiff instructed Taylor to make deposits of Victory Park's receipts into the bank account and to send the deposit slips to plaintiff by Airborne Express to her home.  Taylor sent tax information to plaintiff in this manner as well.  Plaintiff instructed Taylor to take on some increased responsibilities that had previously been done by Marrie. He was in frequent contact with plaintiff.  During the second quarter of 2002, Taylor and plaintiff discussed payments of particular bills. Taylor received IRS notices showing overdue withholding taxes during the second quarter of 2002 and he forwarded them to plaintiff.  Taylor had some conversations with plaintiff regarding these notices. She indicated that the withholding taxes "would be taken care of."  Taylor considered plaintiff to be his "overall supervisor."  (Taylor depo.)

Victory Park maintained computerized bookkeeping records with QuickBooks. According to Taylor, plaintiff made changes on the QuickBooks system during 2002. (*Id.*) Plaintiff acknowledged that she worked with Taylor to "close the books and bring things up-to-date."  Work on payroll tax reports reinforced that payroll taxes had not been paid.  (pltf. depo.)

Victory Park was required to make withholding tax deposits with the IRS within a few days of issuing payroll checks.  Taylor testified that during 2001 he provided plaintiff with the accounting and bookkeeping records so she could review them.  He transmitted payroll records to her every two weeks.  (Taylor depo.)  Plaintiff testified that she did not know whether there were payroll tax reports in the packages Taylor was sending her.  (pltf. depo.)

Taylor also sent Victory Park's bank statements to plaintiff during the first half of 2002

so that she could review and reconcile them which would show the lack of withholding tax deposits.[5]  (Taylor depo.)  Plaintiff had the ability, but did not do the bank reconciliations until July or August 2002.  (pltf. depo.)

Elder Life Services, which was owned and operated by the Grunspans, performed some bookkeeping and accounting services for Victory Park.  It prepared checks that Mr. Grunspan would sign or, occasionally, plaintiff would sign if Mr. Grunspan was unavailable or told her to sign them. (*Id.*)

Plaintiff signed 38 checks for Victory Park during the period from March 29, 2002 and July 12, 2002.  (pltf. depo.; Alan Shapiro decl.)  While plaintiff was in Florida from March through May 2002, she had blank checks that she used to pay bills for Victory Park. (pltf. depo.)

Victory Park was closed and stopped operating on June 30, 2002.  (*Id.*)  On September 15, 2003, the IRS made an assessment against plaintiff for unpaid withholding taxes of Victory Park for the second quarter of 2002.

This matter is before the Court upon the parties' cross-motions for summary judgment. [6]

---

[5]     Taylor was terminated in late 2003 as an employee of entities that were successors to Victory Park in a telephone conference call participated in by plaintiff.

[6]     Defendant filed a combined brief in opposition to plaintiff's motion and in support of its own motion.  The Court previously ordered that the brief be no more than 20 pages in length. As filed, the brief consisted of 18 pages of "undisputed" and "disputed" facts, and two pages of argument.  Defendant's separately filed Motion for Summary Judgment contains no further argument.  The Court notes that this combined brief is a "refiling" of defendant's previous combined brief in opposition to plaintiff's motion and in support of its own motion.  In the earlier filing, defendant presented a 20 page discussion and argument, and attempted to submit a separate 33 page appendix which included the statement of facts.  The Court did not permit the filing of the appendix. Because the second combined brief is a refiling of the first, the Court cannot

7

**Standard of Review**

Summary Judgment is appropriate when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (citing Fed. R. Civ. P. 56(c)); *see also LaPointe v. UAW, Local 600*, 8 F.3d 376, 378 (6th Cir. 1993).  The burden of showing the absence of any such genuine issues of material facts rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits," if any, which it believes demonstrates the absence of a genuine issue of material fact.

*Celotex*, 477 U.S. at 323 (citing Fed. R. Civ. P. 56(c)).  A fact is "material only if its resolution will affect the outcome of the lawsuit."  *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

Once the moving party has satisfied its burden of proof, the burden then shifts to the nonmoving party.  Federal Rule of Civil Procedure 56(e) provides:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of [his] pleadings, but [his response], by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is genuine issue for trial.  If he does not respond, summary judgment, if appropriate, shall be entered against him.

The court must afford all reasonable inferences and construe the evidence in the light most favorable to the nonmoving party.  *Cox v. Kentucky Dep't. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (citation omitted); *see also United States v. Hodges X-Ray, Inc.,* 759 F.2d 557, 562 (6th

---

consider the arguments set forth in the first.  Defendant subsequently filed a reply brief which contains a full discussion of the law.

8

Cir. 1985).  However, the nonmoving party may not simply rely on its pleading, but must "produce evidence that results in a conflict of material fact to be solved by a jury."  *Cox*, 53 F.3d at 150.

Summary judgment should be granted if a party who bears the burden of proof at trial does not establish an essential element of his case.  *Tolton v. American Biodyne, Inc.*, 48 F.3d 937, 941 (6th Cir. 1995) (citing *Celotex*, 477 U.S. at 322).  Accordingly, "the mere existence of a scintilla of evidence in support of plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995) (quoting *Anderson*, 477 U.S. at 52 (1986)).  Moreover, if the evidence is "merely colorable" and not "significantly probative," the court may decide the legal issue and grant summary judgment.  *Anderson*, 477 U.S. at 249-50 (citation omitted).

**Discussion**

**(1) Plaintiff's Motion for Summary Judgment**

Plaintiff argues that she is neither a responsible party nor willfully failed to pay the trust fund taxes.  For the following reasons, the Court disagrees that plaintiff has demonstrated such.

The Sixth Circuit has explained:

> Section 3102 of the Internal Revenue Code of 1954 requires an employer to withhold social security taxes imposed on its employees and section 3402(a) of the Code requires the withholding of income taxes from wages of employees. Withholding taxes are not simply a debt; they are part of the wages of the employee, held by the employer in trust for the government. 26 U.S.C. § 7501. The 'trust fund taxes' are for the exclusive use of the Government and are not to be used to pay the employer's business expenses, including salaries, or for any other purpose.

*Gephart v. United States,* 818 F.2d 469 (6th Cir. 1987) (citations omitted).

A trust fund recovery penalty law has been enacted which gives the government a source

of recovery when losses occur.  26 U.S.C. § 6672(a) states:

> (a) General rule.--Any person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or truthfully account for and pay over such tax, or willfully attempts in any manner to evade or defeat any such tax or the payment thereof, shall, in addition to other penalties provided by law, be liable to a penalty equal to the total amount of the tax evaded, or not collected, or not accounted for and paid over.

Liability under this section attaches if the individual "1) is responsible for paying the taxes and 2) willfully fails to turn over the tax money to the government."  *Bell v. United States,* 355 F.3d 387 (6th Cir. 2004) (citations omitted); *Gephart,* 818 F.2d at 473.

"The determination of responsibility focuses on the 'degree of influence and control which the person exercised over the financial affairs of the corporation and, specifically, disbursements of funds and the priority of payments to creditors.' " *Bell*, 355 F.3d at 393 (quoting *Gephart*, 818 F.2d at 473.)  Factors have been identified to be considered by a court: the duties of the officer as described by the corporate by-laws; the ability of the individual to sign checks for the corporation; the identity of the officers, directors, and shareholders of the corporation; the identity of the individuals who hired and fired employees; and the identity of the individuals who were in control of the financial affairs of the corporation.  *Gephart,* 818 F.2d at 473 (citations omitted).  No one factor is determinative and the Court looks to the totality of the circumstances.

In establishing responsibility, "it is sufficient that the person have significant control over the disbursement of funds."  *Id.* (citations omitted) The person need not have "the final word as to which creditors should be paid."  *Id.*  Absolute control over the corporation's finances is not required to impose liability. *Kinnie v. U.S.,* 994 F.2d 279 (6th Cir. 1993) A responsible person is one "with ultimate authority over expenditure of funds since such a person can fairly be said to

be responsible for the corporation's failure to pay over its taxes, or more explicitly, one who has authority to direct payment of creditors." *Gephart*, 818 F.2d at 473 (quoting *Barrett v. United States*, 580 F.2d 449 (1978) (internal quotations omitted). *See also Cline v. United States,* 1993 WL 272516 (6th Cir. July 21, 1993) ("The test for determining who is a responsible person under Section 6672 is a functional test which focuses on the degree of influence and control which the person exercises over the financial affairs of the corporation, particularly with respect to disbursements of funds and determining the priority of payments to creditors. A person's duty to remit withholding payments to the government must be viewed in light of his power to compel or prohibit the allocation of corporate funds. It is a test of substance, not form.") Additionally, "Although check signing authority is one factor to be considered in determining liability under Section 6672, the relevant inquiry is not simply whether the individual performed the ministerial function of signing a check but, rather, the individual's control over the decision-making process through which allocations to creditors are made." *Id.*  There may be more than one person deemed a "responsible person" within a corporation.  *Gephart*, 818 F.2d at 473.

"Courts have generally given broad interpretation to the term 'responsible person' under section 6672." *Smith v. U.S.,* 555 F.3d 1158 (10th Cir. 2009).

In determining willfulness, the Court looks to that word's "basic definition:" a "responsible person who makes a deliberate choice to voluntarily, consciously, and intentionally pay other creditors rather than make tax payments is liable for willful failure." *Bell,* 355 F.3d at 393 (citations omitted). "The responsible party need not exhibit an intent to defraud the IRS or some other evil motive; all that is necessary to demonstrate willfulness is the existence of an intentional act to pay other creditors before the federal government." *Id.*  The Sixth Circuit

11

holds that "proof of a responsible person's knowledge of payments to other creditors and

awareness of the failure to pay the trust fund taxes is enough to trigger liability."  *Id., Gephart*

("Willfulness is present if the responsible person had knowledge of the tax delinquency and

knowingly failed to rectify it when there were available funds to pay the government.")

The taxpayer has the burden of proving by a preponderance of the evidence that she

either was not a responsible person or that her failure to remit withheld taxes to the government

was not willful.  *Collins v. United States,* 848 F.2d 740 (6th Cir. 1988); *Kinnie v. U.S.,* 994 F.2d

279 (6th Cir. 1993) (A taxpayer claiming that he was not a responsible person liable for

withholding taxes bears the burden of proving that he is not a responsible person and that he did

not act willfully in failing to pay over the taxes.)

**(a) responsible party**

Plaintiff argues that she is not a responsible party as she lacked the authority to control

the process over which Victory Park selected creditors for payment given that she had no control

over the disbursement of funds and she was abused and dominated by her husband who

controlled Victory Park.  On this basis, plaintiff contends, she cannot be held personally liable

for taxes she had neither the ability nor the authority to pay.

Relying on the following testimony she gave at deposition, plaintiff asserts that

individuals other than she controlled Victory Park's finances, she did not determine which bills

would be paid, and she did not exercise control over the payroll. When asked why Medicare or

Medicaid payments which came in after January 2002 were not applied toward overdue federal

withholding taxes, plaintiff testified, "I don't know who controlled the cash.  I don't know

anything...."  (pltf. depo. Vol. I 111) Plaintiff also testified, "I did not make the decision as to

which checks were released for payment.  Will did.... Will, with his executive director, Michael

Campbell, knew what money was in the bank.  And they decided who to pay based on who

screamed the loudest and who they needed to pay off.  I was not involved in operating the

company."  (*Id.* 115) Plaintiff testified that she "had nothing to do with payroll."(*Id.* 118)

Plaintiff testified that during the second and third quarters of 2002, she and Will Grunspan were

the only authorized signators for Victory Park but "that's all I was... It gave me the authority, but

it didn't give me the right to do what I wanted.  Mr. Grunspan had control of all the funds."  (*Id.*

127) "I had no control of what was happening at Victory Park and the moneys or anything.  I had

no control."  (*Id.* 174) When asked whether during the relevant period she understood that the

withholding taxes were not being paid over to the IRS, she testified, "I was not involved in cash

management.  I do not know what was done or what was not done.  I was not involved in day-to-

day operations." (*Id.* 197) "Mr.Grunspan told me what to pay at all times."  "He was in charge."

(*Id.* 243) When asked about checks she signed while in Florida, plaintiff testified, "Well, if I

wasn't directed or approved by my husband, then it was requested by the executive director

because I had nothing to do with the operations of the facility.  So I would know nothing of what

needed to be paid.  So it wasn't a decision I made on my own.  It was somebody said, this needs

to be paid, and since you're the signer and you're the only one that can do it, then you better pay

it because we needed it paid."(*Id.* 142) Marrie and Clark did all the paying of bills until early

February 2002. (*Id.* 84) Plaintiff never directed anyone to cause a payment to be made for a

Victory Park expense without her husband's direction, instruction, or approval. (*Id.* 131) Plaintiff

"had no idea who was and who was not paid.  That was Will's domain."  And, while she knew

the payroll taxes had not been paid, her husband said that he would "handle it."  (*Id.* 198-199)

While she and her husband had disagreements over the withholding taxes, her husband "decided not to pay them." (*Id.* 244)

For the following reasons, the Court finds that plaintiff has not demonstrated as a matter of law that she is not a responsible person.

While plaintiff testified that Clark and Marrie decided what bills to pay until early February 2002, the two were forced out of Victory Park prior to the period at issue (the second quarter of 2002). Plaintiff testified that "in the early part of 2002 we attempted to wrangle control" from Clark and Marrie after it had been discovered in late 2001 that Victory Park had suffered huge losses for 2001 and plaintiff and her husband discovered their abuses. (*Id.* 66-67) Nor was Mike Campbell an authorized signator as plaintiff testified that only she and her husband were authorized to sign checks. Furthermore, as discussed above, in-house bookkeeper Greg Taylor testified regarding his practice of sending financial items and tax information to plaintiff at her house, and discussions he had regarding these matters and bill payments with plaintiff. Thus, plaintiff played a role in the system that was used to pay bills for Victory Park during the relevant period.

Plaintiff contends that she only signed checks when instructed to do so by her husband. But, as defendant points out, plaintiff had the power to refuse to sign the checks and prevent a default on the payment of taxes. In *Thomas v. U.S.,* 41 F.3d 1109 (7th Cir.1994), the Seventh Circuit recognized that possessing check writing authority encompasses the "converse authority to refuse to write checks." Plaintiff admits she could have refused to sign the checks unless her husband agreed that the taxes could be paid. (pltf. depo. 308)

Plaintiff claims that she lacked control and was not involved in Victory Park's

14

operations. Yet, plaintiff testified that she knew the withholding taxes of Victory Park for periods in 2001 were unpaid.  She knew this by going through the books and records.  When she signed checks during the first three quarters of 2002, she knew the 2001 withholding taxes were unpaid. (*Id.* 107) She further testified that she signed two checks for $80,000 each to transfer funds to a payroll account to cover Victory Park payroll while "maybe" knowing that there were unpaid and overdue withholding taxes for the first and second quarters of 2002. In fact, plaintiff testified as to all the checks she signed during the first three quarters of 2002 that "maybe" she knew the withholding taxes had not been fully paid at the time. Additionally, plaintiff testified that she argued with her husband during the second quarter of 2002 about the unpaid taxes. (*Id.* 224-225, 244-245, 207-276)

Plaintiff does not specifically dispute Greg Taylor's testimony that he and plaintiff discussed Victory Park tax matters in the first half of 2002, he forwarded copies of IRS notices regarding Victory Park unpaid withholding taxes to plaintiff during the second and third quarters of 2002, and he discussed the matter of unpaid withholding taxes with plaintiff during the second quarter of 2002.[7] (Taylor depo. 44-45, 63-66) Defendant concedes that there is no evidence that plaintiff prepared or signed payroll checks, but points out that plaintiff testified that she worked with Greg Taylor on payroll tax records and reports.  (pltf. depo. Vol I. 104-107)

Plaintiff relies on interviews of Marrie and Clark conducted by the IRS wherein they did not identify plaintiff as a person responsible for directing or authorizing which bills were paid

---

[7]    When asked at deposition, "Did Mr. Taylor provide you with any notices from the IRS regarding withholding taxes?"  Plaintiff responded, "I don't recall.  He either provided me or Mr. Grunspan." And, "Did Mr. Taylor discuss with you perhaps by telephone any notices from the IRS regarding unpaid withholding taxes?"  Plaintiff responded, "I don't recall."  (pltf. depo. Vol. I 328)

15

for Victory Park.  (Doc. 34 Exs. 1 and 2, Form 4180) These interviews, however, do not show whether or not plaintiff was responsible for paying bills in the second quarter of 2002.  (*Id.*) Further, as discussed above, Clark and Marrie were no longer working at Victory Park during the second quarter of 2002.  Finally, if anything, the interviews support the defendant's position herein.  Clark stated in his interview that Will and Sharona Grunspan maintained or had access to the books and records of Victory Park.  (Ex. 2 at 5) Marrie stated in his interview that "Will and Sharona got involved and cut management fees and wanted to take over everything in order to pay the payroll taxes."  And, Marrie stated that plaintiff was given copies of the the QuickBooks software in November/December 2001.  (Ex. 1 at 5)

Plaintiff does not dispute defendant's evidence showing that she signed 38 checks for Victory Park during the first three quarters of 2002 totaling over $370,000, and as to each check she "maybe" knew the withholding taxes of Victory Park had not been fully paid for the second quarter of 2002.  During the second quarter of 2002, plaintiff signed 30 checks totaling over $240,000, including more than $160,000 from Victory Park's general account to its payroll account to be used to pay net payrolls knowing that the related withholding taxes were not being paid.  It is undisputed that when plaintiff signed checks for Victory Park during the first three quarters of 2002, she knew that withholding taxes for 2001 were unpaid.  (*Id.* 207-276; Shapiro decl.)

Further, during March 12, 2002 through May 18, 2002, plaintiff stayed in Sunny Isles, Florida. She testified that she took 10-20 blank Victory Park checks with her.  Defendant demonstrates that she actually signed about 20 checks.  Plaintiff testified that she signed some checks and made some payments for bills of Victory Park.  Plaintiff testified that the checks

16

were directed or approved by her husband, or the executive director Mike Campbell who indicated that a bill needed to be paid and she was an authorized signer.  (*Id.* 136-137,141-143.) But, plaintiff testified that while she was in Florida, her husband was skiing elsewhere, and that she may have signed checks not directed by her husband if they were "very, very small" or "something that really needed paid that was very, very important or was already on the accounts payable that needed to be paid."  (*Id.* 142-143)   Therefore, not all the payments were directed or approved by her husband.  Additionally, defendant points out that Mike Campbell was not authorized to sign checks for Victory Park and could not order or direct plaintiff to pay a bill, especially given that plaintiff was an owner of Victory Park and Campbell was not.  Plaintiff and her husband were the only authorized signators and sole shareholders after ousting Marrie and Clark.

Plaintiff testified that in early July 2002, she signed a check in the amount of $75,000 to Beachwood Nursing Home, an entity owned by the Grunspans, to repay a loan that Beachwood made to Victory Park to pay its payroll checks for the last pay period in the second quarter of 2002, when it lacked funds. The loan only covered the net payroll to the employees, not the withholding taxes associated with it and plaintiff "maybe" knew that there were unpaid withholding taxes for the second quarter of 2002. (*Id.* 255-258)

Plaintiff asserts that of the 2151 checks signed during the second quarter of 2002, she signed only approximately 1%[8] while her husband signed the other 99%.  (Tania Welch decl. ¶ 3, 5) Plaintiff testified, "Mr. Grunspan instructed me to sign checks received and prepared by

---

[8]     It would have been slightly more than 1% as plaintiff signed 30 checks out of 2151.

17

Victory Park when he could not sign them.  I signed all checks based on his instructions."  And, "I'm going to tell you this again.  I did not want to be involved in Victory Park.  I was against it.  Every check that I signed I was instructed by Mr. Grunspan to sign it."  (pltf. depo. Vol I. 233-234)

As discussed above, however, plaintiff need not have had absolute control over Victory Park's finances in order to be held responsible, nor need she have had the final word over which creditors should be paid.  Defendant has pointed to sufficient evidence showing that plaintiff, an accountant, exercised significant control over Victory Park's finances given that she audited its books and records, participated in ousting Clark and Marrie, oversaw the in-house bookkeeper, engaged in bookkeeping and accounting work, signed checks, and participated in terminating Greg Taylor.

Plaintiff asserts that "the vast majority of checks [she] signed were merely to transfer money among inter-company accounts... she did not prefer creditors over the United States by signing these checks."  (Doc. 19 at 6) (See also plaintiff's reply brief wherein she states that a "significant portion of these checks involve intra-company transfers- not payments to third party creditors.")  But, several of the checks, totaling about $160,000, serve to transfer funds from Victory Park's general account to its payroll account in order to issue paychecks to employees.  Plaintiff testified that she knew when she signed these checks that the funds would not cover the associated withholding taxes and that past employment taxes remained unpaid.  (pltf. depo. Vol. I 224-225)  Thus, employees were preferred over past-due taxes.  Additionally, a check in the amount of $50,000 transferring funds from Victory Park to Victoria Retirement Community, which could have been a loan to Victoria, was money which could have been used to pay the

18

overdue taxes.  Another check plaintiff refers to as an intra-company transfer is a check used to make a payment of $35,000 for overdue rent.  (pltf. depo. 253-254) Again, plaintiff acknowledges that at the time she signed that check she "maybe" understood there were unpaid withholding taxes for the second quarter of 2002.  (*Id.*)  This too would be a payment to a creditor in preference to the taxes owed to defendant, even if the creditor is another company owned by plaintiff and her husband.

Plaintiff maintains that defendant provides no evidence that she was a director of Victory Park and she testified that she was unsure of who served as Victory Park's directors.  Defendant, however, submits a letter that plaintiff admits she and her husband sent to Clark and Marrie in December 2001 regarding the latter's failure to make the withholding tax payments.  The letter states that plaintiff and her husband had previously requested Clark's and Marrie's presence at a Board of Directors meeting, which was scheduled at plaintiff's and her husband's "earliest availability," but Clark and Marrie did not comply.  This seems to indicate that the four were members of the Board of Directors. (Doc. 35 Ex. 46) Plaintiff also asserts that Mr. Grunspan, Clark, and Marrie were Victory Park's operating shareholders, while she was merely a minority shareholder.  But, Clark and Marrie were forced out in early 2002, prior to the period at issue here.

Plaintiff also asserts that she did not hire or fire employees.  But, the evidence shows that she participated in firing Greg Taylor and in forcing out Clark and Marrie.

Plaintiff posits that her involvement with Victory Park extended only to the performance of a few simple accounting and clerical functions, but her deposition testimony shows otherwise.  As discussed above, in November and December 2001, she examined the books and records of

19

Victory Park and identified unpaid withholding taxes.  This resulted in the ousting of Clark and

Marrie by plaintiff and her husband.  Plaintiff worked with Greg Taylor, Victory Park's in-house

bookkeeper, on financial and tax matters.  Taylor forwarded IRS notices concerning overdue

withholding taxes to plaintiff. The two discussed the tax matters.  After January 2002, plaintiff

worked with Taylor to update Victory Park's books and records, including the payroll tax

records.  Plaintiff had access to the QuickBooks- the online books and records.  After Clark's

and Marrie's departure, plaintiff's husband asked her to handle the accounting and bookkeeping

while he handled the other departments.  (pltf. depo. Vol II 74)

Plaintiff argues that she was abused and dominated by her husband and, as a result, had

no control over Victory Park's funds.  Plaintiff points to her deposition testimony that her

husband threatened her more than once with divorce and that she feared being left alone to raise

her children.  She complied with his demands as a result of these fears.  His temper manifested in

"feigned"physical violence and throwing dishes.  He verbally berated plaintiff in front of others,

and plaintiff's personal assistant testified that he constantly screamed at plaintiff. When plaintiff

attempted to disagree with her husband over the initial acquisition of Victory Park, he threw her

clothes in the backyard and moved to a motel which demonstrated that he was manipulative and

domineering.  Her husband threatened to kill plaintiff if she disobeyed his directives regarding

the outstanding taxes.  Plaintiff argues that she took this threat seriously as evidenced by her

deposition testimony:

> It was an off the cuff remark that said, don't you dare take any money from the other
> facilities to pay the taxes that those idiots didn't pay.  I'll kill you if you do.  Now, I
> didn't take- - I know that you considered that a threat.  I considered it a threat as well.  I
> wasn't going to take the money and pay it, okay.  I had no control of Victory and Victoria
> whatever I tried to do.  It was his baby.

20

(pltf. depo. Vol. I 307)

Plaintiff relies on *Barrett v. United States,* 580 F.2d 449 (Ct.Cl. 1978), wherein a wife was found to not be a responsible person for purposes of § 6672.  But that case is distinguishable.  The court found the following facts to support its finding: the husband ran the business with an "iron hand"; he turned the check-signing over to his wife only after creditors and employees refused to accept the company's checks and demanded cash payments due to the husband's mismanagement; the husband compelled his wife to sign checks over her objection by berating her publicly, threatening her, and at times beating her; the wife was afraid of her husband and as a result was submissive and subservient to him in all matters; the husband forced his wife on multiple occasions to loan or otherwise provide her private wealth to the business, some of which was never repaid; the wife's "basic function" for the company was to sign checks at the direction of her husband, although she also picked up mail at the post office and deposited receipts at the bank because these "chores" gave her "something to do"; the wife discussed with her husband the need to pay withholding taxes as she was aware of the company's past experiences with the IRS, but the husband told her "he would take care of the matter"; and the wife was not an officer, director, or shareholder of the corporation.

While the wife in *Barrett* was "beaten" by her husband who had a "short and violent temper," plaintiff testified that her husband was never physically abusive toward her. (pltf. depo. Vol. I 52, 55) While plaintiff asserts, as discussed immediately above, that she took his death threat seriously, plaintiff also testified:

Well, he threatened me, but I didn't believe him.  I think he just said it in the heat of the moment because he had a very bad temper, okay?  That's all I would say.

(*Id.* 303) Plaintiff additionally testified that she and her husband "always argued about Norwood

21

and Victory or Victoria until the day he died," "we always argued about Victory Park" even after the threat, and she also yelled at her husband.  (*Id.* 193, 306, Vol. II 67-68) Unlike the wife in *Barrett,* there is no evidence that plaintiff's husband herein coerced her into signing checks.  Nor does the evidence show that plaintiff was afraid or subservient to her husband, only that she feared he would divorce her.[9]

The Court agrees with defendant that to accept plaintiff's argument would create a new defense to responsibility based on one spouse's fear that the other would quit the marriage if he or she would not join the other in violating withholding tax laws.  Plaintiff knew that in signing checks to pay creditors other than the IRS when withholding taxes were overdue, she was failing to fulfill the tax obligations.  Unlike the wife in *Barrett,* plaintiff appears to have been a director and was a shareholder, and participated in the financial matters concerning Victory Park.

Finally, other district courts have rejected attempts by wives who claim they are not responsible parties due to their domineering or verbally abusive husbands.  *See Holzman v. U.S.,* 1993 WL 556456 (D.Col. 1993) (The court found the wife to be a responsible person despite the husband's affidavit testimony that his wife had "total, unquestioning obedience"  "My wife knew that disobedience would threaten her marriage.  It would have ultimately caused her physical harm as well...") and *Luce v. Luce,* 119 F.Supp.2d 779 (S.D.Ohio 2000) (The wife argued that she was merely carrying out the business decisions of her husband who decided who did and did not get paid, and those decisions were not to be questioned.  The court recognized that in businesses operated by family members, particularly spouses, one may be slow to overrule the

---

[9]     While plaintiff asserts that her fear of raising her children on her own perpetuated her acquiescence to her husband, in 2002 her children were ages 30, 19, and 16.

other "in order to preserve family harmony." But the court concluded that "this sort of reasoning would subvert the liberal purpose of the statute by allowing responsible parties to escape liability under § 6672 in family business situations.")

For the foregoing reasons, the Court finds that plaintiff fails to establish as a matter of law that she is not a responsible person.

**(b) Willfulness**

Plaintiff argues that she did not willfully fail to remit the trust fund taxes because she did not voluntarily write checks preferring other creditors over the United States given that she only wrote checks on Mr. Grunspan's direct orders.  Additionally, plaintiff asserts that she was completely dominated, controlled, and abused by her husband.  She feared for her life and was coerced by threats of losing her husband.

As discussed above, plaintiff has not demonstrated that she only wrote checks on Mr. Grunspan's direct orders.  Nor has plaintiff established that her husband completely dominated and abused her, or that she feared for her life.  Threats of losing her husband are insufficient to absolve plaintiff of responsibility.  Rather, the evidence shows that plaintiff did sign checks during the first three quarters of 2002 knowing the 2001 withholding taxes were unpaid and "maybe" the taxes for those periods were overdue.  She testified that she argued with her husband during the second quarter of 2002 about her view that the overdue withholding taxes of Victory Park should be paid. During the second quarter of 2002, plaintiff signed two $80,000 checks on the Victory Park general account transferring funds to its payroll account that were used to pay net payrolls.  She knew that the withholding taxes relating to those payrolls were not paid to the IRS from the funds transferred.  (pltf. depo. Vol. I 224-227) When plaintiff signed

those checks, she knew the funds would not be used to pay the related withholding taxes.

For the foregoing reasons, the Court finds that plaintiff fails to establish as a matter of law that her failure was not willful.

For these reasons, plaintiff's Motion for Summary Judgment is denied.

### (2) Defendant's Motion for Summary Judgment

Defendant argues that it is entitled to summary judgment because the facts demonstrate that plaintiff is a responsible person who willfully failed to collect, account for, or pay the withholding taxes for Victory Park for the second quarter of 2002.        Defendant argues that plaintiff had the power to refuse to sign the thirty checks she signed during the period in issue, totaling over $240,000, which is in excess of the amount of unpaid withholding taxes at issue. Plaintiff paid funds to other creditors at a time when she knew or should have known that the withholding taxes were not paid and transferred funds to be used for net payroll, knowing that no provisions were being made to pay the related withholding taxes.

### (a) Responsible Person

Based on the foregoing discussion, the Court finds that defendant has established, as a matter of law, that plaintiff is a responsible person.

Case law establishes that the term "responsible person" is interpreted broadly.  Despite plaintiff's deposition testimony that she lacked control, the evidence shows that plaintiff had, and exercised, sufficient authority at Victory Park to render her a responsible person.  She and her husband were the only signators, and had taken complete control over Victory Park just prior to the second quarter of 2002.  Even accepting plaintiff's testimony that she only signed checks at her husband's direction, she had the power to refuse to sign checks to prevent a default on the

24

payment of taxes.  At a minimum, plaintiff admitted to signing some checks while she was in Florida without her husband's direction or approval.  She admittedly knew the withholding taxes for periods in 2001 were unpaid and had no reason to believe that they had been paid for the quarter at issue.  In fact, she signed checks during this period while "maybe" knowing the taxes were unpaid.  She discussed the issue of unpaid taxes with her husband.  Plaintiff signed checks transferring funds to cover net payroll, but not the associated withholding taxes.  Plaintiff, an accountant, performed bookkeeping and accounting work for Victory Park.  She has not demonstrated that her husband's verbal abuse and domination absolved her of liability.  Plaintiff signed checks during the second quarter of 2002 in an amount which exceeded the amount of unpaid withholding taxes for the period.

For these reasons, and those discussed above regarding plaintiff's motion, no genuine issue of material fact exists as to whether plaintiff was a responsible person.

### (b) Willfulness

Nor does an issue of fact remain as to plaintiff's willful failure to pay the trust fund taxes. Plaintiff testified that she knew the requirements for withholding taxes and the consequences for not paying them.  She had personal knowledge that the 2001 taxes were unpaid.  When she signed checks during the first three quarters of 2002, she also knew or should have known that the taxes for the period at issue were likewise unpaid.  Plaintiff signed checks transferring funds for Victory Park's payroll account while knowing that the related withholding taxes were not being paid.  Plaintiff testified that when she signed the 30 checks during the second quarter of 2002, she could not have simply paid the payroll taxes instead because "there was no money." (pltf. depo. 308-309) As discussed above, plaintiff has not demonstrated that her husband's

25

abuse excuses her willfulness.   In fact, plaintiff testified that if she had written a check for the unpaid taxes instead of signing the other checks during the period at issue, her husband would have left her.  (*Id.*)  Threats of losing her husband are insufficient to absolve plaintiff of willfulness.

For these reasons, and those discussed above regarding plaintiff's motion, no genuine issue of material fact exists as to whether plaintiff willfully failed to remit the taxes.

For the foregoing reasons, defendant's Motion for Summary Judgment is granted.

**Conclusion**

For the foregoing reasons, plaintiff's Motion for Summary Judgment is denied and United States of America's Motion for Summary Judgment is granted.

IT IS SO ORDERED.


 /s/ Patricia A. Gaughan
PATRICIA A. GAUGHAN
United States District Judge


Dated: 3/21/12

26